Filed 8/13/21  P. v. Gonzalez CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>CECILIO GONZALEZ,<br><br>    Defendant and Appellant. | B305263<br><br>(Los Angeles County<br> Super. Ct. No. BA480612) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Terry A. Bork, Judge.  Affirmed.

Lillian Hamrick, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters and Susan Sullivan Pithey, Assistant Attorneys General, Paul M. Roadarmel, Jr. and Stephanie A. Miyoshi, Deputy Attorneys General, for Plaintiff and Respondent.

———————————————

1

Cecilio Gonzalez appeals from a judgment after a jury convicted him of assault with a deadly weapon. Gonzalez contends the trial court erred in instructing the jury with CALCRIM No. 875, which defined a deadly weapon as either one that is inherently deadly or one used in a way that is capable of causing and likely to cause death or great bodily injury. Gonzalez argues the weapon here, a metal pole, was not inherently deadly as a matter of law, and therefore the trial court's instruction of the jury on the definition of an inherently deadly weapon was prejudicial error under the Supreme Court's decision in *People v. Aledamat* (2019) 8 Cal.5th 1 (*Aledamat*). Gonzalez also contends, the People concede, and we agree that Gonzalez was entitled to 368 days of presentence custody credit instead of the 212 days awarded by the trial court.

We modify the judgment to award Gonzalez the full 368 days of presentence custody credits and order that the abstract of judgment be corrected. We affirm the judgment as modified.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *The Information*

The amended information charged Gonzalez[1] with a single count of assault with a deadly weapon, a metal pipe. (Pen. Code, § 245, subd. (a)(1).)[2] The information further alleged Gonzalez had previously been convicted of three serious or violent felonies

---

[1] The original information charged Gonzalez as David Alboniga. The court amended the information on the first day of trial after Gonzalez stated his true name.

[2] All further undesignated statutory references are to the Penal Code.

under the three strikes law (§§ 667, subds. (b)-(j), and 1170.12), and one of the prior convictions was of a serious felony within the meaning of section 667, subdivision (a)(1).

B.    *The Evidence at Trial*

    1.    *The prosecution case*

On August 22, 2019 Los Angeles Police Officer Eduardo Gutierrez was on "camera detail," monitoring and controlling multiple cameras that were placed on the streets of the "skid row" area in downtown Los Angeles. The cameras were set up so an officer in a remote location could control the camera with a joystick and zoom in and out of the scene. At around 6:00 a.m. Officer Gutierrez observed on one of the video cameras an altercation between two people taking place around San Pedro and Fifth Streets. As described by Officer Gutierrez, Gonzalez can be seen walking next to a wall on the south curb of Fifth Street and then holding what appeared to be a metal pole. Holding the pole behind his back, Gonzalez walked up behind an unidentified man (John Doe) and "swung at the victim, struck him [on] what appeared to be on his head." Doe then fled west onto Fifth Street. Officer Gutierrez zoomed the camera out, but he could not see where Doe was headed. Officer Gutierrez did not see Doe assault Gonzalez or anyone else. The surveillance video showing the incident was played for the jury; it did not have any audio.

Officer Gutierrez informed Los Angeles Police Officer Gerardo Valvaneda about the incident and provided him the location and a description of Gonzalez. Several hours after the incident, Officer Valvaneda drove to the area depicted in the video, which was an area lined with multiple tents on the

3

sidewalk.  Officer Valvaneda observed Gonzalez sitting on a chair on the south curb of Fifth Street near San Pedro Street.  Officer Valvaneda canvassed the area, but he could not locate Doe.  Officer Valvaneda had a brief interaction with Gonzalez, then returned to the police station.

At the police station, Officer Valvaneda reviewed the video of the altercation to confirm Gonzalez was the person who struck Doe.  After reviewing the video, Officer Valvaneda was confident Gonzalez was the suspect seen in the video.  Officer Valvaneda then returned to Fifth and San Pedro Streets with a supervisor.  Officer Valvaneda located the weapon used to assault Doe next to a wheelchair leaning against a gate near the curb where Officer Valvaneda had earlier encountered Gonzalez.  At this point Officer Valvaneda arrested Gonzalez.

The weapon was admitted into evidence at trial.  The prosecutor described the weapon as a "metal object" and a "metal rod."  The object was passed around the jury box for the jurors to touch and hold, so they could, as the prosecutor described, "ascertain its strength by feeling it."  Defense counsel referred to the weapon in his opening statement and during trial as a fishing pole.[3]

---

[3]    At side bar in the context of Gonzalez's motion to dismiss under section 1118.1, the trial court described the object:  "And I have People's 9 in my hand, and there do appear to be parts that are metallic and then a part that is wood and then some padded parts as well.  So it's not entirely metallic, although it does—the actual pole itself seems to be largely metallic, if not entirely."  Gonzalez's counsel argued, "The information suggests that there is a piece of pipe like for plumbing or something like that.  I don't think this is a weapon, per se.  So I suppose that's part of my motion, your honor."  The court agreed the weapon was not a

2.    *The defense case*

Gonzalez testified he woke up around 6:00 a.m. on the day of the incident.  After talking with some friends, Gonzalez gave Doe $5 to buy Gonzalez breakfast.[4]  Another person also gave Doe money to buy the person food.  Doe did not return for an hour or two.  After Doe returned without food, Gonzalez confronted him about Gonzalez's food and money.  Gonzalez got in a "scuffle" with Doe in which Doe threw him to the ground, causing Gonzalez to scrape his left elbow and thigh.  As Gonzalez started to get off the ground, Doe pushed him down again.  Gonzalez believed Doe was "high off spice."[5]

The scuffle occurred near the corner of Sixth Street and Crocker Avenue.  After the scuffle, Doe went "around the corner and started arguing with the other man that gave him money to eat."  At this point the surveillance video (at time stamp 6:04:13 a.m.) shows Doe arguing with an elderly man in the street a few minutes prior to the incident.  The elderly man held a cane.  As

---

plumbing pipe, explaining, "[B]ut I think it can accurately be called a pipe even though you would probably in common parlance more likely call it a metal rod or a metal tube or something along those lines.  But I don't think the word "'pipe'" is inaccurate, per se."  The court denied Gonzalez's motion.

4    Gonzalez did not know Doe's true name; Gonzalez and his friends called him "Rico."

5    "Spice" is a "synthetic cannabinoid" (the active ingredient in cannabis).  (See <http://www.drugabuse.gov/publications/ drugfacts/spice-synthetic-marijuana> (National Institute on Drug Abuse) [as of Aug. 12, 2021].)

Doe walked away, the elderly man walked toward the middle of the street and continued arguing with Doe.

Gonzalez was concerned for the safety of the elderly man and believed Doe needed to be stopped.  Gonzalez testified he "grabbed a metal pipe," walked up to Doe, and tried "to scare him off."  Gonzalez added, "I swung the pipe but never hit . . . the gentleman."  Doe flinched when Gonzalez swung the metal pole, but Gonzalez fell and never struck Doe with the pole.  Five to 10 minutes had elapsed between the time of the initial scuffle and when Gonzalez swung the metal pole.  Gonzalez testified the metal pole shown in court "looks like a different metal pole to me . . . ."  He added, "No.  That's not the metal pole I had . . . ."

On cross-examination, the prosecutor played the video (with audio) from Officer Valvaneda's body camera showing his initial interaction with Gonzalez.  Gonzalez acknowledged at trial that when he first spoke with Officer Valvaneda, he gave a false name, David Alboniga.  Officer Valvaneda stated to Gonzalez that he saw Gonzalez sneak up on Doe and then "crack[] him on the back."  Gonzalez responded, "No you didn't see[] the earlier part . . . .  See he threw me on the ground man.  Come on man."  Officer Valvaneda responded, "Hey regardless of what it is.  You can't do that.  Okay?"  Gonzalez replied, "You are right."  Officer Valvaneda then added, "You compare . . . what you did to what he did, you can't do that."  Gonzalez responded, "You['re] right sir, man.  You know when you are mad.  When you are mad, when somebody do[es] something to you, and then—that was my reaction at the time because I was upset."  The prosecutor

followed up and asked, "You attacked the victim because you were mad, right?" Gonzalez replied, "Yeah, man."[6]

Defense counsel recalled Officer Valvaneda, who clarified that when he stated to Gonzalez that he saw Gonzalez "crack[] him in the back," Officer Valvaneda was basing this on his single viewing of the surveillance video, at which time it was his opinion that Gonzalez "had possibly got struck in the back."

C.     *The Verdict and Sentencing*

The jury found Gonzalez guilty of assault with a deadly weapon. In a bifurcated proceeding, Gonzalez admitted the prior conviction allegations were true. The trial court sentenced Gonzalez to an aggregate prison term of 13 years. The court imposed the upper term of four years for the assault with a deadly weapon, doubled under the three strikes law,[7] plus an additional five-year prison term pursuant to section 667, subdivision (a)(1). The court awarded Gonzalez 184 actual days plus 28 days conduct credit (calculated pursuant to section 2933.1) for a total of 212 days of prejudgment custody credit.

Gonzalez timely appealed.

---

[6]     Gonzalez admitted during cross-examination he had previously been convicted of robbery, driving without the owner's consent, and receiving stolen property.

[7]     The trial court granted Gonzalez's motion to strike two of his prior strikes under *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497.

## DISCUSSION

A. *The Trial Court Did Not Prejudicially Err by*
   *Instructing the Jury with CALCRIM No. 875*

Gonzalez contends the trial court erred in instructing the jury with a version of CALCRIM No. 875 that defined an "inherently deadly" weapon because the weapon used here was not inherently deadly as a matter of law. The People contend the court did not err because the various descriptions of the weapon, including a metal pole and a metal pipe, and the fact the pole was made of solid metal, could have led the jury to conclude the weapon was inherently deadly. We conclude that even if the trial court erred in instructing the jury on the definition of an inherently deadly weapon, any error was harmless.

   1. *The trial court's instruction with CALCRIM No. 875*
      *and closing arguments*

The trial court instructed the jury with CALCRIM No. 875 on the elements of assault with a deadly weapon. As the court instructed, "The defendant is charged in count 1 with assault with a deadly weapon other than a firearm, in violation of Penal Code section 245. To prove that the defendant is guilty of this crime, the People must prove that: One, the defendant did an act with a deadly weapon other than a firearm that by its nature would directly and probably result in the application of force to a person; [¶] Two, the defendant did that act willfully; [¶] Three, when the defendant acted, he was aware of facts that would lead a reasonable person to realize that his act by its nature would directly and probably result in the application of force to someone; [¶] Four, when the defendant acted, he had the

8

present ability to apply force with a deadly weapon to a person; [¶] And, five, the defendant did not act in self-defense or in defense of others. . . . [¶] . . . [¶] A deadly weapon is any object, instrument, or weapon that is inherently deadly or one that is used in such a way that it's capable of causing and likely to cause death or great bodily injury. An object is inherently deadly if it is deadly or dangerous in the ordinary use for which it is designed. In deciding whether an object is a deadly weapon, consider all the surrounding circumstances."

The trial court further instructed the jury with CALCRIM No. 200 in relevant part that "[s]ome of these instructions may not apply depending on your findings about the facts of the case. Do not assume, just because I give a particular instruction, that I am suggesting anything about the facts. After you have decided what the facts are, follow the instructions that do apply to the facts as you find them."

The prosecutor argued in his closing argument that Gonzalez used the metal pole as a deadly weapon, asserting, "[Gonzalez] had plenty of time to pick up a weapon, to ascertain the strength of that weapon, and to hold that weapon for a considerable amount of time, and then waiting for the right moment to go behind John Doe in an obscure manner so that he couldn't be noticed, and then striking John Doe with a deadly weapon. This is a textbook assault with a deadly weapon case . . . . [¶] . . . But what I'm . . . getting at, ladies and gentlemen, is the force that this carries . . . when you hold it from the very end. And I'm not even gonna try to swing it here because I'm scared . . . . But the momentum that this would come with, the centrifugal force that it would impart on a person, huge. Huge."

9

Gonzalez's counsel argued that the metal pole was "a fishing pole" because it had grooves where a wheel would be attached, and it was never intended to be used as a weapon. Further, Gonzalez acted "reasonably under the circumstances" and was protecting the elderly man by scaring off Doe. Moreover, bystanders watching the incident "were basically thanking him" for "defusing the situation" by giving Gonzalez a fist bump and clapping. Gonzalez's counsel added that Gonzalez "only swung once. He didn't chase him down afterwards to try to hurt him or anything like that. He basically solved the problem."

During deliberations, the jury sent a note to the court with three questions: "1. How do you define significant or great bodily injury? [¶] 2. Can we get clarification on the definition of "deadly weapon?" [¶] 3. Can we get the transcript of when the defendant swung and missed? What area of the body?" The court responded by rereading portions of CALCRIM No. 875 to the jury, including the definitions of a "deadly weapon" and "inherently deadly" weapon, and it directed the court reporter to read back the relevant testimony about the incident.

2. *The weapon used by Gonzalez was not inherently deadly*

"'Some few objects, such as dirks and blackjacks, have been held to be deadly weapons as a matter of law; the ordinary use for which they are designed establishes their character as such. [Citation.] Other objects, while not deadly per se, may be used, under certain circumstances, in a manner likely to produce death or great bodily injury. In determining whether an object not inherently deadly or dangerous is used as such, the trier of fact may consider the nature of the object, the manner in which it is

10

used, and all other facts relevant to the issue.'" (*Aledamat, supra*, 8 Cal.5th at p. 6; accord, *People v. Perez* (2018) 4 Cal.5th 1055, 1065.) As the Supreme Court in *Aledamat* explained with respect to a box cutter, it is "'a type of knife' that, 'because it is designed to cut things and not people,' is not an inherently deadly weapon as a matter of law . . . .'" (*Aledamat*, at p. 6.)

Like the box cutter in *Aledamat*, and unlike dirks and blackjacks that have no ordinary use other than as a deadly weapon, a metal pole can have various uses such as a metal pipe for construction, a parking bollard, or a walking stick. The People failed to present any evidence that the metal pole was designed to be used as a deadly weapon. Further, the prosecutor described the pole as a metal pipe, which by its nature would be used for an innocent purpose, not as a deadly weapon.[8]

### 3. Aledamat *and alternative-theory error*

Gonzalez argues it was reversible error for the trial court to instruct the jury with both a legally correct theory (that the weapon was deadly as used) and a legally incorrect theory (that

---

[8] *People v. Jurado* (2006) 38 Cal.4th 72, relied on by the People, does not support their argument the weapon used here was inherently deadly. In *Jurado*, the Supreme Court considered whether there was substantial evidence the weapon the defendant possessed in jail was a deadly weapon within the meaning of section 4574, which makes it a felony for a county jail inmate to possess a deadly weapon. (*Id*. at p. 137.) The court concluded there was substantial evidence the defendant possessed a steel object 12 to 18 inches long, and the defendant did not dispute that if the weapon was a steel object, it was a deadly weapon. (*Ibid*.) The court therefore never addressed whether the steel object was an inherently deadly weapon.

11

the weapon was inherently deadly), relying on *Aledamat, supra*, 8 Cal.5th 1.

In *Aledamat*, the Supreme Court held a trial court commits instructional error when it instructs the jury with CALCRIM No. 875 that it can find a weapon is a deadly weapon because it is inherently deadly, where the weapon is not inherently deadly as a matter of law. (*Aledamat, supra*, 8 Cal.5th at pp. 4, 6; see *People v. Guiton* (1993) 4 Cal.4th 1116, 1129 (*Guiton*) ["It is error to give an instruction which, while correctly stating a principle of law, has no application to the facts of the case."].) However, the *Aledamat* court distinguished between a factually inadequate theory where "the theory is incorrect only because the evidence does not support it" and a legally inadequate theory where "the theory is incorrect because it is contrary to law." (*Aledamat, supra*, 8 Cal.5th at p. 7; accord, *Guiton*, at p. 1128.) The *Aledamat* court explained, "[I]f the inadequacy of proof is purely factual, of a kind the jury is fully equipped to detect, reversal is not required whenever a valid ground for the verdict remains, absent an affirmative indication in the record that the verdict actually did rest on the inadequate ground." (*Aledamat*, at p. 7; accord, *Guiton* at p. 1129.) But when the jury is instructed with a legally inadequate theory,[9] the "'beyond a reasonable doubt' standard of review established in [*Chapman v. California* (1967)

---

[9] The *Aledamat* court gave as an example of a legally inadequate theory, the instructional error in *People v. Green* (1980) 27 Cal.3d 1, where the Supreme Court concluded movement of the victim 90 feet in that case was legally insufficient to constitute asportation for kidnapping. (*Aledamat, supra*, 8 Cal.5th at p. 7; accord, *Guiton, supra*, 4 Cal.4th at p. 1128.)

386 U.S. 18, 24], for federal constitutional error applies." (*Aledamat*, at p. 3.)  Under this standard, "[t]he reviewing court must reverse the conviction unless, after examining the entire cause, including the evidence, and considering all relevant circumstances, it determines the error was harmless beyond a reasonable doubt."  (*Id.* at p. 14)

The *Aledamat* court concluded the trial court's instruction that the jury could find the box cutter was a deadly weapon because it was inherently deadly was based on a legally invalid theory because the jury was not provided the definition of an inherently deadly weapon, and therefore "the jury would not be equipped to know that, contrary to what the instruction suggested, a box cutter is *not* an inherently deadly weapon." (*Aledamat, supra*, 8 Cal.5th at p. 8.)  However, the court concluded the error was harmless beyond a reasonable doubt under the more stringent *Chapman* harmless error standard. (*Aledamat*, at p. 15.)

In contrast to *Aledamat*, the trial court instructed the jury on the definition of an inherently deadly weapon, correctly explaining an object "is inherently deadly if it is deadly or dangerous in the ordinary use for which it is designed."  The court also instructed the jury with CALCRIM No. 200 that not all instructions provided by the court will apply to the case. Accordingly, the jury here was equipped to determine whether the weapon Gonzalez used was inherently deadly in the manner in which it was used.  Therefore, any error in instructing the jury was factual error subject to review under the standard set forth in *People v. Watson* (1956) 46 Cal.2d 818.  (*Guiton, supra*, 4 Cal.4th at p. 1130 ["The error is therefore one of state law subject to the traditional *Watson* test."].)  "Under *Watson*, reversal is

13

required if it is reasonably probable the result would have been more favorable to the defendant had the error not occurred." (*Guiton*, at p. 1130.)

4. *Any instructional error was harmless*

As discussed, the trial court instructed the jury on the definition of an inherently deadly weapon, and therefore the jury was well equipped to determine whether the metal pole used here was inherently deadly. Further, the trial court directed the jury to consider all the surrounding circumstances to determine whether the object used was a deadly weapon, which the jury reasonably would have interpreted as applying to a determination of whether the weapon was deadly as used or inherently deadly. (See *Aledamat, supra*, 8 Cal.5th at pp. 14-15.) As the *Aledamat* court explained, "The jury would likely view the 'inherently deadly' language in light of this additional instruction that it had to consider all of the circumstances. Given this additional instruction, it seems unlikely the jury would simply view the box cutter as inherently deadly without considering the circumstances, including how defendant used it." (*Ibid.*)

In addition, as Gonzalez acknowledges, the prosecutor did not argue in his closing argument that the weapon was inherently deadly. "Courts look to the prosecutor's argument as a relevant circumstance in determining whether instructional error is harmless." (*People v. Powell* (2021) 63 Cal.App.5th 689, 715.) In his closing argument, the prosecutor told the jury he was afraid to swing the weapon due to the centrifugal force it would create, which would be "huge." The prosecutor emphasized that Gonzalez first held the weapon to ascertain its strength, then snuck up behind Doe and struck him with it. And as in

14

*Aledamat*, there was no suggestion from the prosecutor or defense counsel that the jury could find the metal pole was a deadly weapon under one of two alternative theories. (See *Aledamat, supra*, 8 Cal.5th at p. 14.)

Gonzalez argues the jury's questions relating to whether the metal pole was a deadly weapon signaled it was struggling to determine whether the pole was a deadly weapon. Questions asked by a jury may show the jury based its verdict on an erroneous theory. (*Aledamat, supra*, 8 Cal.5th at p. 12.) Here, the jury requested the definition of a deadly weapon and the term "great bodily injury," as well as readback of the testimony about Gonzalez swinging the weapon. Nothing about the jury's questions suggests the jurors were considering whether the weapon was inherently deadly. To the contrary, the jurors appear to have focused on whether the metal pole was deadly as used, requesting to hear the testimony about how Gonzalez swung the pole. Further, the trial court responded to the questions by rereading the instruction that defined an inherently deadly weapon and directed the jury to consider all the circumstances of the incident in deciding whether the weapon was deadly, again providing the jury with the tools to determine whether the weapon was inherently deadly or deadly as used. And as discussed, the jury was instructed that not all instructions applied to the facts of the case.

Moreover, in finding Gonzalez guilty of assaulting Doe with a deadly weapon, the jury must have found the following elements to be true: (1) Gonzalez acted with a deadly weapon (either inherently or as used) that by its nature would directly and probably result in force being applied; (2) Gonzalez acted willfully; (3) Gonzalez was aware of facts that would lead a

15

reasonable person to know his act would directly and probably result in force being applied to Doe; (4) Gonzalez had the ability to apply force with a deadly weapon to Doe; and (5) Gonzalez did not act in self-defense or in self-defense of others. As the *Aledamat* court observed, a reasonable jury could not make these findings without also finding the defendant used the object in a manner that was capable of causing and likely to cause great bodily injury. (See *Aledamat*, *supra*, 8 Cal.5th at p. 15 ["'[n]o reasonable jury that made all of these findings could have failed to find' that defendant used the box cutter in a way that is capable of causing or likely to cause death or great bodily injury"].) Thus, it is not reasonably probable the verdict would have been more favorable to Gonzalez had the trial court not instructed the jury on an inherently deadly weapon. (*Guiton, supra*, 4 Cal.4th at p. 1130.)

B.     *The Trial Court Must Correct Gonzalez's Custody Credits*

Gonzalez contends, the People concede, and we agree the trial court erred in calculating Gonzalez's prejudgment actual custody credits at 212 instead of 368 days. Section 2933.1, subdivision (a), limits presentence conduct credit to 15 percent for persons convicted of violent felonies listed in section 667.5, subdivision (c). (*In re Reeves* (2005) 35 Cal.4th 765, 768; accord, *People v. Hernandez* (2017) 10 Cal.App.5th 192, 201.) The trial court awarded Gonzalez 184 days of actual custody credits and 28 days conduct credits based on the assumption the 15 percent limitation under section 2933.1 applied. However, assault with a deadly weapon in violation of section 245, subdivision (a)(1), is not one of the listed felonies under section 667.5, subdivision (c). Accordingly, Gonzalez was entitled to 368 days of presentence

16

conduct credit, including 184 actual days and the full 184 days of conduct credits.  (§ 4019, subd. (f).)

## DISPOSITION

The judgment of conviction is modified to award Gonzalez 368 days of presentence custody credits.  As modified, the judgment is affirmed.  The superior court is directed to prepare a corrected abstract of judgment proving a total of 368 days of presentence credits (184 actual days plus 184 days of conduct credits), and to forward a copy of the corrected abstract of judgment to the Department of Corrections and Rehabilitation.


                                             FEUER, J.

We concur:


        PERLUSS, P. J.


        IBARRA, J.*

---

\*      Judge of the Santa Clara County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.